**COURT OF APPEALS
DECISION
DATED AND FILED**

**September 9, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP328**

**STATE OF WISCONSIN**

Cir. Ct. No. 2019TR8850

**IN COURT OF APPEALS
DISTRICT IV**

COUNTY OF JEFFERSON,

    PLAINTIFF-RESPONDENT,

V.

JULIANNE TRISTA WEDL,

    DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Jefferson County: DENNIS P. MARONEY, Judge. *Affirmed*.

¶1 GRAHAM, J.[1] Julianne Wedl was found guilty of operating a motor vehicle while under the influence of an intoxicant, first offense. On appeal,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version.

Wedl argues that the circuit court erroneously denied her pretrial motion to suppress evidence obtained in an investigation because the investigation was not supported by reasonable suspicion. I conclude that, by the time that Wedl was seized for constitutional purposes, there was reasonable suspicion to believe that she was driving with a prohibited alcohol concentration or while under the influence of an intoxicant to a degree that rendered her incapable of safely driving. Accordingly, the circuit court properly denied Wedl's suppression motion, and I affirm the order.

## BACKGROUND

¶2 The following facts, which are generally undisputed, are taken from the hearing on Wedl's motion to suppress. The two officers involved in her arrest, Deputy Michael Williams and Deputy William Johnson, both testified during the hearing and the circuit court appeared to credit their testimony.

¶3 Shortly after midnight on November 28, 2019, law enforcement was called to the scene of a vehicle engulfed in flames. Deputy Williams was the first on-duty officer to arrive on the scene. Upon arrival, he made contact with Wedl and another individual who was an off-duty police officer. Wedl, who had been driving by and spotted the burning vehicle, had been concerned that somebody might be trapped inside and had pulled over to render assistance.

¶4 When Williams first approached Wedl, she appeared to be in shock. Wedl told Williams that she had tried to look into the vehicle, but she had been unable to determine whether anyone was inside.

¶5 During their discussion, Williams detected "an odor of intoxicants emitting from [Wedl's] breath when she spoke," which made him suspect that she

2

had been operating her motor vehicle while intoxicated (OWI).[2]  Williams did not convey his suspicions to Wedl.  According to his later testimony, Williams "told [Wedl] that somebody would be with her shortly … to get a witness statement in regards to the vehicle fire."  He suggested that Wedl wait in the back of his squad car because it was "chilly" outside, and he left to address the fire.

¶6      Unbeknownst to Wedl, Williams arranged for another officer to come to the scene for a "possible OWI investigation."  Deputy Johnson, who had been employed as a deputy for 10 years and had received training in the investigation of OWI-related offenses, responded to Williams' radio dispatch and arrived on the scene shortly thereafter.

¶7      Upon his arrival, Johnson made contact with Wedl and the off-duty officer, who were standing outside of a vehicle.  When Johnson approached, the off-duty officer asked whether anything more was needed of him, and Johnson told the off-duty officer he could go.  At that point, only Johnson and Wedl remained.  Johnson later described Wedl as "distraught" and "crying."  He asked Wedl what brought her to the scene and what she had observed.  Wedl indicated that she had been driving home when she came across the burning vehicle, and that, when she attempted to open the door, the flames came toward her forcing her to back away.

---

[2] The Wisconsin Jury Instructions use "OWI" as an umbrella term, which encompasses operating while under the influence of an intoxicant (to a degree that renders the driver incapable of safely driving), contrary to WIS. STAT. § 346.63(1)(a), and operating with a prohibited alcohol concentration (as defined by WIS. STAT. § 340.01(46m)), contrary to WIS. STAT. § 346.63(1)(b). I follow the same convention in this opinion.

¶8      In his testimony, Johnson acknowledged that Wedl was cooperative throughout the interaction, and he did not observe Wedl slur her speech, speak in an unusual manner, stumble, or struggle to maintain her balance.   However, Johnson "could detect an odor of intoxicants coming from [Wedl's] breath" and, in the report he filled out within hours of her arrest, he described the odor as "strong."   Johnson also observed that Wedl's eyes were "glossy [sic] and bloodshot."

¶9      Johnson asked Wedl whether she had been drinking.  Wedl stated that she had been at a friend's house and had consumed "a few" or a "couple" glasses of wine, and, that the glasses were "regular sized."  Johnson then informed Wedl that he was going to administer field sobriety tests.  Ultimately, Johnson determined that Wedl was intoxicated.

¶10     Wedl was later charged with two counts:  operating a motor vehicle while under the influence of an intoxicant in violation of WIS. STAT. § 346.63(1)(a) and operating a motor vehicle with a prohibited alcohol concentration (PAC) in violation of § 346.63(1)(b), both as first offenses. Throughout the remainder of this opinion, I refer to these two offenses collectively as "OWI-related offenses."

¶11     Wedl pled not guilty and moved to suppress the statements and evidence gathered during an allegedly "unlawful seizure" that was initiated by Williams and "extended" by Johnson.   She argued that the officers lacked reasonable suspicion to detain her for an OWI investigation and to administer field sobriety tests.

¶12     Following the evidentiary hearing, the circuit court denied Wedl's motion.[3]  It concluded that the officers had reasonable suspicion to believe that Wedl "was consuming alcohol and driving," and therefore it was lawful for them to ask her to perform field sobriety tests.  The court did not specifically comment on when Wedl was seized for constitutional purposes.

¶13     The circuit court later clarified that it had not concluded that the officers only needed to have a reasonable suspicion that Wedl was drinking and driving to administer field sobriety tests, but rather, that they needed to have a reasonable suspicion that she was intoxicated.  The circuit court then reaffirmed its earlier decision to deny Wedl's motion to suppress, concluding that the officers had reasonable suspicion to believe that Wedl was intoxicated based on Wedl's admission to drinking and driving, the odor of intoxicants on her breath, Wedl's glassy and bloodshot eyes, and the fact that her encounter with law enforcement occurred at "bar time."

¶14     Wedl was found guilty of operating under the influence, and the PAC charge was dropped by operation of law.  She appeals based on the circuit court's denial of her motion to suppress.

## DISCUSSION

¶15     The review an order granting or denying a suppression motion presents an issue of constitutional fact.  *State v. Howes*, 2017 WI 18, ¶17, 373

---

[3] The Honorable Robert Dehring presided over the proceedings addressing Wedl's motion to suppress.  The Honorable Dennis Maroney, Reserve Judge, presided over Wedl's eventual trial and found her guilty of operating under the influence of an intoxicant contrary to WIS. STAT. § 346.63(1)(a).

Wis. 2d 468, 893 N.W.2d 812. On appeal, I uphold the circuit court's findings of fact unless they are clearly erroneous, and I independently review the application of constitutional principles to those facts. **State v. Young**, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729.

¶16 Wedl challenges the circuit court's denial of her motion to suppress on two grounds. First, she asserts that Deputy Williams lacked reasonable suspicion to detain her for an OWI investigation. Second, she asserts that Deputy Johnson lacked reasonable suspicion to "expand" Williams' initial detention to administer field sobriety tests. In response, the State argues that Williams never "seized" Wedl, and therefore, he did not need reasonable suspicion to ask her to remain on the scene to give a witness statement. According to the State, Wedl was not seized until Johnson told her he would be administering field sobriety tests, and, at that point, Johnson had the reasonable suspicion necessary to seize Wedl and administer those tests.

¶17 In the analysis that follows, I first consider whether and when Wedl was seized, ultimately concluding that she was not seized for Fourth Amendment purposes until Johnson informed her that he would be administering field sobriety tests. I then consider whether Johnson had reasonable suspicion that Wedl had committed an OWI-related offense at that time, and I conclude that he did.

**I**

¶18 The Fourth Amendment to the United States Constitution prohibits unreasonable "searches" and "seizures." U.S. CONST. amend. IV; *see also* WIS. CONST. art. I, § 11 (providing similar prohibitions and protections). The protections of the Fourth Amendment are implicated when a government agent "searches" or "seizes" a person or their property. **Young**, 294 Wis. 2d 1, ¶23.

¶19 Investigatory stops, sometimes referred to as *Terry* stops, are considered to be seizures within the meaning of the Fourth Amendment. *Id.*, ¶20 & n.6 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Such stops, which typically entail only temporary questioning, are less intrusive than custodial arrests and are constitutional if police have reasonable suspicion to believe that a crime has been, is being, or is about to be committed. *Young*, 294 Wis. 2d 1, ¶20.

¶20 "Not all encounters with law enforcement officers are 'seizures' within the meaning of the Fourth Amendment." *State v. Williams*, 2002 WI 94, ¶20, 255 Wis. 2d 1, 646 N.W.2d 834; *see also County of Grant v. Vogt*, 2014 WI 76, ¶19, 356 Wis. 2d 343, 850 N.W.2d 253. For example, a seizure does not occur every time a law enforcement officer approaches an individual on the street and asks questions. *See Williams*, 255 Wis. 2d 1, ¶22; *Vogt*, 2014 Wis. 2d ¶24. Such encounters are considered to be consensual in nature, "[a]s long as a reasonable person would [feel they were] free to disregard the police presence and go about [their] business." *Young*, 294 Wis. 2d 1, ¶18 (internal citation omitted). "Generally, … police-[individual] contact [only] becomes a seizure … 'when an officer by means of physical force or show of authority, has in some way restrained [a person's] liberty.'" *Id.*, ¶18 (quoting *Williams*, 255 Wis. 2d 1, ¶20 (quoting *United States v. Mendenhall*, 446 U.S. 544, 552 (1980))).

¶21 To decide whether an individual has been "seized" by "show of authority," we ask whether, in view of "all the circumstances surrounding the incident, a reasonable person would not have felt free to leave." *Young*, 294 Wis. 2d 1, ¶37 (citing *Mendenhall*, 446 U.S. 552). Circumstances that might indicate a seizure include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person …, or the use of language or tone of voice indicating compliance with the officer's request might

be compelled.'" ***Williams***, 255 Wis. 2d 1, ¶21 (quoting ***Mendenhall***, 446 U.S. at 554-55).

¶22    With those legal principles in mind, I now examine whether and when Wedl was seized.  Wedl argues that Williams seized her when he told her "somebody would be with her shortly … to get [her witness] statement in regards to the vehicle fire" and suggested that she remain in the back of his squad car. Wedl contends that she complied with what she alleges was Williams' "show of authority" by remaining on the scene until Johnson arrived, and that no reasonable person in her position would have felt free to leave before an officer arrived to record their witness statement.  I conclude that any show of authority by Williams was insufficient to give rise to a reasonable belief that Wedl was not free to leave.

¶23    First, Williams did nothing to cause Wedl to be physically present at the scene—she was already present when Williams arrived.

¶24    Second, there is no evidence suggesting that Williams commanded Wedl to remain on the scene, or that he even explicitly told her to do so. *See **Vogt***, 356 Wis. 2d 343, ¶¶40, 43 (considering whether officer commanded suspect to roll down window).  Instead, the evidence suggests that Williams merely informed Wedl that "somebody would be with her shortly … to get [her] witness statement," and that he suggested, rather than commanded, that she wait in the back of his squad car to keep warm.  There is no evidence that Williams spoke in a harsh or threatening tone of voice that suggested Wedl's compliance with his request was mandated. *See **id.***, ¶¶11-12, 43 & n.18 (considering whether officer's voice was "forceful," and whether he said "please" and "thank you").

¶25    Third, there is no evidence that Williams flaunted any symbols of his official authority in an attempt to compel Wedl to remain on the scene.  Although

Williams activated his squad car lights when he arrived, he did so prior to encountering Wedl, and it does not appear that his lights were directed at Wedl or her vehicle. *See Young*, 294 Wis. 2d 1, ¶25 (considering officer's use of a spotlight, emergency flashers, and whether he activated his red and blue emergency lights). Instead, it appears that Williams activated his squad car lights to alert passing traffic of the dangerous road condition involving the burning vehicle.

¶26 Finally, there is no evidence that Williams, who was the sole on-duty officer on the scene at that time, restrained Wedl's freedom of movement in any manner, either directly or indirectly. For example, Williams did not physically touch Wedl, nor did he usher her into his squad car. *See Williams*, 255 Wis. 2d 1, ¶¶20-21 (citing *Mendenhall*, 446 U.S. at 554-55) (restraining a person's freedom of movement is an objective indicator of a "seizure."). Williams did not park his squad car in front of Wedl's vehicle in an attempt to prevent her from leaving. *See Vogt*, 356 Wis. 2d 343, ¶¶12, 42 (considering the location of an officer's squad car in relation to the suspect's vehicle and whether other physical impediments may have prevented a reasonable person from leaving). On the contrary, it appears that, after their brief exchange, Williams left Wedl completely to her own devices. Indeed, the evidence suggests that Wedl did not feel compelled to stay in Williams' squad car and was instead standing outside talking with the off-duty officer at the time Johnson arrived.

¶27 Wedl argues that the fact that Williams suspected her of OWI should be pertinent to the analysis. That is, she contends that Williams kept her at the scene on a "ruse," and that this "ruse" should somehow factor into the analysis of whether Wedl was seized. However, the test for whether a suspect has been seized is objective—the question is whether a reasonable person in Wedl's position,

9

knowing all of the facts that Wedl was aware of in that moment, would have felt that she was not free to leave. *See Vogt*, 356 Wis. 2d 343, ¶30 (citing *Williams*, 255 Wis. 2d 1, ¶23). The test leaves no room for the subjective mindsets of the officers, unless the officers somehow communicate or physically manifest their beliefs or opinions to the suspect. *See generally Williams*, 255 Wis. 2d 1, ¶23. Likewise, the test does not consider information learned by the suspect about the officer's subjective mindset after the fact. Therefore, any "ruse" by Williams is not germane to the analysis.

¶28 Stepping back, it appears that Wedl remained on the scene, believing herself to be a witness and not a suspect, because of a desire or engrained social pressure to cooperate with the investigation. To be sure, individuals "may feel tethered by social norms to [comply with] an officer's request and may consent in order to avoid the taboo of disrespecting an officer of the law." *Vogt*, 356 Wis. 2d 343, ¶31. However, the fact that individuals may willingly respond to police requests "'hardly eliminates the consensual nature of the response'" and does not transform the consensual encounter into a seizure. *Id.*, ¶24 (quoted source omitted); *see also Young*, 294 Wis. 2d 1, ¶37. Because any show of authority by Williams was insufficient, I conclude that he did not seize Wedl.

¶29 Having reached that conclusion, I now consider whether and when Deputy Johnson's contact with Wedl resulted in a seizure. In so doing, I observe that Wedl does not explicitly develop any alternative theory of when she was seized. The State, by contrast, contends that Johnson first seized Wedl for Fourth Amendment purposes when he told her that he would be conducting field sobriety tests, but not before.

¶30    I agree with the State that Wedl was not seized before Johnson informed her that he would be conducting field sobriety tests. In so doing, I reject as immaterial a suggestion in Wedl's brief that a reasonable person in her position may have suspected that she had become a suspect when Johnson allowed the off-duty officer to leave, but did not tell Wedl that she too could leave. Wedl does not argue that she, like the off-duty officer, ever asked or attempted to leave, nor does she argue that Johnson made any display of his authority that prevented her from doing so. I likewise reject any argument that Wedl could make that Johnson's initial questioning amounted to a seizure. Although Johnson had already commenced an OWI investigation when he began questioning Wedl, an investigatory stop does not occur merely because law enforcement approaches an individual to ask questions, and Johnson's subjective intentions are not dispositive of the inquiry. *See* *Vogt*, 356 Wis. 2d 343, ¶¶24-25 (explaining that police questioning by itself is unlikely to result in a seizure, and that the seizure test is objective). Throughout the brief duration of his questioning, there is no evidence that Johnson made any threatening or intimidating display of his authority, or that he restrained Wedl's freedom of movement in any manner. Accordingly, Johnson's questioning of Wedl amounted to a consensual encounter, not a seizure. *Cf.* *Young*, 294 Wis. 2d 1, ¶18 ("Generally … police-[individual] contact only becomes a seizure … 'when an officer by means of physical force or show of authority has in some way restrained the liberty of the [individual].'" (quoted sources omitted)).

¶31    The State argues that Wedl was seized when Johnson told Wedl he would be administering field sobriety tests. The State does not cite any authority for this proposition, but I assume without deciding that the State is correct, and that no reasonable person in Wedl's position would have felt free to leave or to

refuse to take the tests without facing legal consequences for doing so. Therefore, I conclude that Wedl was first seized for Fourth Amendment purposes when Johnson informed her that he would be conducting field sobriety tests.

## II

¶32 As discussed, for an investigatory stop to be constitutional, it must be supported by reasonable suspicion that a person has committed or is committing a crime. *County of Jefferson v. Renz*, 231 Wis. 2d 293, 310, 603 N.W.2d 541 (1999); *see also State v. Genous*, 2021 WI 50, ¶7, 397 Wis. 2d 293, 961 N.W.2d 41. The test for reasonable suspicion is grounded in common sense—what would a reasonable police officer reasonably suspect, in light of their training and experience, based on the totality of facts and circumstances and the reasonable inferences to be drawn therefrom. *State v. Post*, 2007 WI 60, ¶13, 301 Wis. 2d 1, 733 N.W.2d 634.

¶33 I now consider whether Johnson's seizure of Wedl to administer field sobriety tests was supported by reasonable suspicion that Wedl had committed an OWI-related offense, "the investigation of which would be furthered by such tests." *State v. Hogan*, 2015 WI 76, ¶37, 364 Wis. 2d 167, 868 N.W.2d 124. In so doing, I bear in mind that reasonable suspicion is not a high bar, *Genous*, 397 Wis. 2d 293, ¶8 (citing *Young*, 294 Wis. 2d 1, ¶21; *State v. Eason*, 2001 WI 98, ¶19, 245 Wis. 2d 206, 629 N.W.2d 625), and "'the level of suspicion that the [reasonable suspicion] standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause[.]'" *State v. Nimmer*, 2022 WI 47, ¶25, 402 Wis. 2d 416, 975 N.W.2d 598 (quoted source omitted).

¶34    Here, it is undisputed that Johnson knew from Wedl's own statements that Wedl had been drinking wine at a friend's house, and that she had driven her vehicle after doing so.  Wedl argues, and I agree, that more was needed for Johnson to reasonably suspect she had committed an OWI-related offense.

¶35    Under Wisconsin law, not every person who has consumed alcoholic beverages prior to operating a motor vehicle has committed an OWI-related offense.  *See* WIS JI—CRIMINAL 2663.  Instead, the law specifically prohibits a person from driving with a PAC—which, as relevant here, was .08 or more, WIS. STAT. § 340.01(46m)—or from driving under the influence of an intoxicant "to a degree that renders him or her incapable of safely driving."   WIS. STAT. § 346.63(1)(b), (a); *see also* WIS JI—CRIMINAL 2663 (being "under the influence" of an intoxicant as that phrase is used in § 346.63(1)(a) means that the "person has consumed a sufficient amount of alcohol to cause the person to be less able to exercise the clear judgment and steady hand necessary to control the motor vehicle").  Accordingly, it was not enough for Deputy Johnson to know that Wedl drank alcohol before she drove her motor vehicle.  The critical inquiry is whether, based on the totality of facts and circumstances known to Johnson, he could reasonably suspect that Wedl's blood alcohol concentration was more than .08, or that she was under the influence of an intoxicant to a degree that impaired her ability to drive.  *See* ***State v. Gentry***, No. 2012AP59-CR, unpublished slip. op. ¶6 (WI App May 24, 2012); ***State v. Dotson***, No. 2019AP1082-CR, unpublished slip. op. ¶15 (WI App Nov. 24, 2020); ***County of Sauk v. Leon***, No. 2010AP1593,

13

unpublished slip. op. ¶28 (WI App Nov. 24, 2010).[4] Facts that may give rise to a reasonable belief that a suspect has driven while intoxicated include observations of a suspect's driving, admissions to drinking, or physical indicators of intoxication.

¶36    In this case, neither officer observed Wedl's driving. Wedl points out that this fact distinguishes her case from many other OWI cases, in which the OWI investigation follows on the heels of a traffic stop initiated after an officer observes a mechanical defect, a traffic violation, or unsafe driving. *See, e.g.*, *State v. Colstad*, 2003 WI App 25, 260 Wis. 2d 406, 659 N.W.2d 394; *State v. Betow*, 226 Wis. 2d 90, 593 N.W.2d 499 (Ct. App. 1999). In such cases, the officer's observations of the suspect's driving often contribute to a determination that there was reasonable suspicion to expand the scope of the traffic stop and commence an OWI investigation. *See State v. Adell*, 2021 WI App 72, ¶25, 399 Wis. 2d 399, 966 N.W.2d 115 (speeding is a plus factor that adds to reasonable suspicion that a suspect has committed an OWI-related offense); *Town of Freedom v. Fellinger*, No. 2013AP614, unpublished slip. op. ¶24 (WI App Aug. 6, 2013) (defendant's speeding contributed to reasonable suspicion of an OWI-related offense because it "showed [the defendant's] nonconformance with the law").

---

[4] The situation would be different if the suspect were subject to a PAC of .02 and the officer was aware of that fact. *See State v. Goss*, 2011 WI 104, ¶¶25-27, 338 Wis. 2d 72, 806 N.W.2d 918 (odor of intoxicants on driver that officer knew was subject to a .02 PAC alone provided probable cause for a preliminary breath test because the officer knew that the suspect "could drink only a very small amount before exceeding the legal limit").

Throughout this opinion, I cite authored but unpublished opinions by this court for their persuasive value consistent with WIS. STAT. § 809.23(3).

¶37    That said, Johnson did not need to observe Wedl's driving to reasonably suspect that she had driven while intoxicated so long as he was aware of other facts that created reasonable suspicion of intoxication.

¶38    Wedl emphasizes that Johnson did not observe several typical physical indicators of intoxication, such as slurred speech, stumbling, or belligerent behavior.  Although that is true, Johnson nonetheless was aware of three significant facts that, taken together along with the reasonable inferences derived therefrom, provided reasonable suspicion that Wedl had a PAC of .08 or more, was under the influence of an intoxicant to a degree that impaired her ability to drive, or both.

¶39    First, Wedl told Johnson that she had consumed "a couple" or a "few" regular-sized glasses of wine.  Wedl contends that this admission established only that she had been legally drinking and driving, and no more, and perhaps I would agree if Wedl's admission were the only indicator of intoxication.  I nevertheless observe that a "couple" or a "few" glasses of wine is not an insignificant amount of alcohol and, according to charts published by the state department of transportation, may be enough to push some individuals over the legal limit, depending on their body weight and how recently they consumed those glasses of wine.[5]

¶40    Wedl suggests that the fact that she readily admitted to consuming alcohol is indicative of innocence rather than guilt.  To be sure, a suspect's denial or attempt to cover up obviously true facts sometimes suggests consciousness of

_____

[5] *See* Wis. Dep't of Transportation, *.08 BAC Law in Wisconsin*, available at https://wisconsindot.gov/Documents/safety/education/drunk-drv/08law.pdf.

guilt. But the opposite premise is not accurate. A suspect's admission of inculpatory facts adds to reasonable suspicion, rather than detracting from it. *See Renz*, 231 Wis. 2d at 316 (suspect's admission to drinking three beers earlier in the evening was one fact that contributed to probable cause).

¶41 Second, the circuit court found that Johnson detected a "strong odor of intoxicants" emitting directly from Wedl's breath.[6] That Johnson, an officer trained in administering OWI investigations,[7] detected the strong odor of intoxicants emitting directly from Wedl's breath adds to the reasonable suspicion equation. *See Renz*, 231 Wis. 2d at 316-17 (odor of intoxicants is an indicator of intoxication); *cf. State v. Gonzalez*, No. 2013AP2585-CR, unpublished slip. op. (WI App May 8, 2014) (no reasonable suspicion where the sole indicator of intoxication was the odor of intoxicants emitting from the vehicle, but not specifically from the driver); *State v. Meye*, No. 2010AP336, unpublished slip. op. (WI App July 14, 2010) (the strong odor of intoxicants coming from one or both of two individuals who had just exited a vehicle did not, by itself, suffice to establish reasonable suspicion).

---

[6] Wedl attempts to undermine confidence in the circuit court's finding that the odor was strong. She points out that, during the suppression hearing, Deputy Williams and Deputy Johnson both testified that they detected an "odor of intoxicants" without specifically characterizing the strength of that odor. However, Johnson had characterized the odor as "strong" in the report he filed shortly after the arrest, and when questioned about his report during the hearing, he did not disagree with his prior assessment of the strength of the odor. The testimony by both officers is perfectly consistent with Johnson's later clarification that the odor was strong, which was consistent with the report he wrote shortly after the fact, and which was credited by the circuit court. Wedl has not demonstrated that the circuit court's finding is clearly erroneous.

[7] *See State v. Hogan*, 2015 WI 76, ¶47, 346 Wis. 2d 167, 868 N.W.2d 124 (experience of officer is a "plus" in reasonable suspicion equation).

¶42    Wedl argues that, because Johnson did not know when she had started or stopped drinking wine that night, the "strong odor of intoxicants" established only that she had been drinking and driving, which, again, was itself insufficient to create reasonable suspicion. However, even without additional information, Johnson could still reasonably infer from the strength of the odor that Wedl had recently consumed a large enough quantity of alcohol that its odor was still evident on her breath. Although the odor of alcohol, by itself, may not establish reasonable suspicion that a suspect has committed an OWI, it nevertheless serves as a significant "building block" for reasonable suspicion. *See State v. Waldner*, 206 Wis. 2d 51, 58, 556 N.W.2d 681 (1996).

¶43    Third, Johnson observed that Wedl's eyes were glassy and bloodshot, which is a common physical indicator of intoxication. *See State v. Kennedy*, 2014 WI 132, ¶22, 359 Wis. 2d 454, 856 N.W.2d 834 (discussing glassy and bloodshot eyes as a factor sufficient to support a finding of probable cause to arrest for drunk-driving related offense).[8]

¶44    Wedl acknowledges that glassy and bloodshot eyes could give rise to reasonable suspicion under some circumstances, but she argues that any such inference was not reasonable here because her glassy and bloodshot eyes could have been caused by crying, exposure to the fire and smoke, or both. Based on the facts available to Johnson, a reasonable officer would have inferred that the appearance of Wedl's eyes had been caused by either intoxication, crying,

---

[8] *See also State v. Tullberg*, 2014 WI 134, ¶35, 359 Wis. 2d 421, 857 N.W.2d 120 (glassy and bloodshot eyes are an indicator of intoxication); *State v. Anker*, No. 2020AP1218, unpublished slip. op. ¶17 (WI App May 13, 2021) (same); *County of Sauk v. Leon*, No. 2010AP1593, unpublished slip. op. ¶10 (WI App Nov. 24, 2010) (noting that glassy and bloodshot eyes constitute a physical sign of impairment).

exposure to fire and smoke, or any combination of the above, and Johnson was not required to draw inferences favoring innocence. *State v. Nieves*, 2007 WI App 189, ¶14, 304 Wis. 2d 182, 738 N.W.2d 125; *Hogan*, 364 Wis. 2d 167, ¶¶36, 50. That there were potential innocent explanations lessens, but by no means eliminates, the probative value of Wedl's glassy and bloodshot eyes.

¶45 Finally, Wedl points out that her actions at the scene were those of a "good Samaritan," and she argues that this fact should detract from a finding of reasonable suspicion. Specifically, Wedl contends that stopping to render assistance reflected "clear thinking on her part," along with "a sense of moral responsibility befitting a sober individual," and were "contraindicative of impairment." I am not persuaded. I acknowledge that Wedl's actions were brave, but I do not agree that bravery is necessarily an indicator of sobriety.

¶46 To be sure, the facts here present a close case, and none of the three indicators of intoxication discussed above are definitive of guilt. But reasonable suspicion does not require definitive proof, or even proof that guilt was more probable than not. I conclude that the facts discussed above, when considered in the aggregate, *see Waldner*, 206 Wis. 2d at 58, gave Johnson reasonable suspicion that Wedl had been operating a motor vehicle with a blood alcohol concentration of .08 or more, or while under the influence to a degree that rendered her incapable of safely driving, or both.[9] Accordingly, Johnson's seizure of Wedl for

---

[9] In its reasonable suspicion analysis, the circuit court also relied on the fact that Wedl was driving at approximately midnight, which the court characterized as "bar time." I agree with Wedl that this fact adds little to the reasonable suspicion equation beyond what Deputy Johnson already knew. Johnson did not have to make any inferences about the likelihood that Wedl had been drinking based on the time of the day, given that Wedl specifically acknowledged that she had been drinking.

purposes of field sobriety testing was reasonable, and the circuit court properly denied Wedl's motion to suppress.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.